ARCHER, Chief Judge.
Hughes Aircraft Company (Hughes) appeals the judgment of the United States Court of Federal Claims awarding Hughes compensation based on a 1% royalty rate with respect to spacecraft manufactured and used by or for the United States which embody the invention of Hughes’ United States Patent No. 3,758,051 (the Williams patent). Hughes Aircraft Co. v. United States, 31 Fed. Cl. 481, 35 USPQ2d 1243 (1994) (Hughes XII ).[1] Hughes argues that the 1% royalty rate is too low. The United States cross-appeals contending that certain spacecraft were incorrectly included in the royalty base and that the interest rates used to *1569 calculate Hughes’ delay damages were too high. We affirm.
BACKGROUND
A. The Williams patent relates to an apparatus for controlling the orientation of the spin axis of spin-stabilized space vehicles such as satellites positioned in orbit around the earth. The patent was issued to Donald Williams on September 11, 1973. To correct orbital deviations, the Williams apparatus applies a reactive force to the satellite by firing a jet so as to “precess,” or tip, the satellite into the proper position. Although this technique was known in the prior art,[2] the Williams apparatus was the first to maintain its spin axis with reference to a fixed external coordinate system. Hughes Aircraft Co. v. United States, 717 F.2d 1351, 1360, 219 USPQ 473, 479 (Fed.Cir.1983) (Hughes VII).
The present suit began in 1973 when Hughes brought a claim under 28 U.S.C. § 1498 against the United States for just compensation stemming from the use and manufacture by or for the government of spacecraft embodying the invention claimed in the Williams patent. During the course of the protracted litigation that followed, it was determined by the Court of Federal Claims that Hughes is entitled to just compensation with respect to 81 spacecraft. Hughes Aircraft Co. v. United States, 29 Fed. Cl. 197, 243-8, 29 USPQ2d 1974, 2010 (1993) (Hughes X). The court arrived at the final list of 81 spacecraft based in part on the 1983 decision of this court that certain accused spacecraft that use the “store and execute” method for controlling the precession jet infringe the claims of the Williams patent under the doctrine of equivalents. Hughes VII, 717 F.2d at 1366, 219 USPQ at 484. The Court of Federal Claims then found the value of the compensation base for calculating Hughes’ award to be $3.577 billion, which was arrived at by using “total spacecraft cost,” i.e., the total procurement cost, including payload costs, to the government of the 81 spacecraft. Hughes Aircraft Co. v. United States, 31 Fed. Cl. 464, 468 n. 5, 477 (1994) (Hughes XI).
In Hughes XII, the Court of Federal Claims considered only the calculation of the amount of Hughes’ award. The court first determined what royalty rate to apply to the compensation base to provide Hughes a reasonable royalty for the government’s use of the patented invention. The court then considered the amount of pre-judgment interest (sometimes called “delay damages”), which together with the reasonable royalty would provide “reasonable and entire compensation.” Hughes XII, 31 Fed.Cl. at 483, 35 USPQ2d at 1251. Because an established royalty rate did not .exist for licensing the Williams patent, the court determined the royalty rate using the “willing buyer/willing seller” rule. Id. at 484, 35 USPQ2d at 1245. Under this rule, a reasonable royalty is set at the rate that the court determines a “willing licensor and licensee would bargain for at hypothetical negotiations on the date infringement started.” State Indus. v. Mor-Flo Indus., 883 F.2d 1573, 1580, 12 USPQ2d 1026, 1031 (Fed.Cir.1989).
The court’s royalty rate analysis focused initially on three letters containing acceptable license terms that Hughes had sent to other aerospace companies during the period from 1974 to 1978, none of which resulted in a licensing agreement. The first was a July 1974 letter from Hughes to the Philco-Ford Corporation (Philco-Ford) offering to license the Williams patent and the McLean patent together for 5%, or separately for 3%, of “the sales price of the satellite calculated at the time it is delivered to the launch pad.” Hughes XII, 31 Fed. Cl. at 486, 35 USPQ2d at 1246. Although Hughes’ letter was sent while a suit was pending against Philco-Ford in which Hughes accused Philco-Ford of infringing the Williams patent, the court found nothing in the letter to suggest that the offer was part of a proposed settlement of the litigation and found that the letter was sent by Hughes merely in response to earlier requests by Philco-Ford for terms at which any licenses had been offered to parties un *1570 related to the suit. Id. at 486, 35 USPQ2d at 1247.
The second letter relied on by the court was sent by Hughes to TRW, Inc. (TRW) in September of 1974 and offered a license at the identical rate described in the letter to Philco-Ford. Id. at 486, 35 USPQ2d at 1247. The court noted that there had never been any litigation or threat of litigation between Hughes and TRW relating to the Williams patent. Id. at 486, 35 USPQ2d at 1247. With regard to the TRW and Phileo-Ford letters, the court found it significant that the anticipated royalty base underlying those offers was smaller than the royalty base in this case. Id. at 487, 35 USPQ2d at 1247.
The third letter was sent by Hughes to Messerschmitt-Bolkow-Blohm (MBB), a German corporation, as part of a series of letters regarding settlement of claims by Hughes against MBB. Id. at 487, 35 USPQ2d at 1247. As such, the court recognized that this letter could not fairly be considered an ordinary proposal of licensing terms. Id. at 487, 35 USPQ2d at 1247. The court instead relied on language in the letter in which Hughes stated that its “normal royalty rate” for licensing the Williams and McLean patents together was 5% of the “full contact price” for a commercial spacecraft or 2% of the “full contract price” for a scientific or experimental spacecraft, with the provision that the cost of scientific or experimental spacecraft did not include the cost of scientific or experimental payloads provided to MBB by others. Id. at 487, 35 USPQ2d at 1247. The court found that all of the 81 spacecraft in the royalty base were “scientific or experimental vehicles.” Id. at 487, 35 USPQ2d at 1247. As Hughes had done in its Ford-Philco and TRW letters, the court reduced the 2% rate quoted in the MBB letter for both the Williams and McLean patents by a factor of 40% to arrive at a 1.2% rate for licensing only the Williams patent for scientific or experimental vehicles. Id. at 487, 35 USPQ2d at 1247.
Based on the three offers, the Court of Federal Claims reasoned that negotiations would start at a rate of something less than 1.2% and that the negotiated rates would not fall below the 1% rate the government conceded would result in just compensation. Id. at 488, 35 USPQ2d at 1248. According to the court, the royalty rate would “quickly settle on one percent.” Id. at 488, 35 USPQ2d at 1248. As additional support for the 1% royalty rate, the court pointed to the large size of the royalty base in this case. The court said that “[i]t is axiomatic that the larger the potential compensation base to which a royalty rate will be applied, the lower will be the rate.” Id. at 488, 35 USPQ2d at 1248-49. The court also noted that Williams was not a “pioneer” invention, that the license taken by the government was non-exclusive and unaccompanied by know-how, that the Hughes license offers to the aerospace companies were not accepted, and that Hughes had an incentive to discourage the development of alternative technology and encourage the use of the Williams invention. Id. at 488-89, 35 USPQ2d at 1249-50. As to this last factor the court found that alternatives to the Williams invention existed in 1973 or were soon after developed. Id. at 489-90, 35 USPQ2d at 1250. Based on all of these factors, the court determined that a royalty rate of 1% would be reasonable.
The Court of Federal Claims next considered the appropriate interest rate to use in calculating the delay damages to be awarded Hughes because royalties were not currently paid. The court' viewed delay damages as necessary to place Hughes in the position that it would have been had the royalties been paid timely and invested in a prudent and reasonable manner. Id. at 492, 35 USPQ2d at 1251-52. For the period from September 11, 1973 to February 1, 1980, the court used rates which it viewed as required by or adopted in prior decisions for the years in question, citing Tektronix, Inc. v. United States, 213 Ct.Cl. 257, 552 F.2d 343, 193 USPQ 385 (1977), Miller v. United States, 223 Ct.Cl. 352, 620 F.2d 812 (1980), and Bendix Corp. v. United States, 230 Ct.Cl. 247, 676 F.2d 606 (1982). Specifically, it used a rate of 7.5% for the period up to 1975 and a rate of 8.5% for the period from 1976 to February 1, 1980. Hughes XII, 31 Fed. Cl. at 492-93, 35 USPQ2d at 1252-53. For the remainder of the period of delay, the court applied the relevant tax overpayment rate as *1571 prescribed in 26 U.S.C. § 6621, which was defined as 2% above the federal short term rate determined by the Secretary of the Treasury. The court found the tax overpayment rates to be fair, easily ascertainable, commercially reasonable, and objective, with the federal short term rate reflecting the short-term financial market and the 2% additional margin taking into account the fact that long term investments generally earn higher rates. Id. at 494, 35 USPQ2d at 1253-54. The court held that the delay damages for the period from 1973 to 1980 should be compounded annually and for the period after February 1, 1980 should be compounded daily as provided for in the tax overpayment compounding provision, 26 U.S.C. § 6622(a). Id. at 493, 494-95, 35 USPQ2d at 1253,1254.
B. In this appeal Hughes puts forth several grounds for reversing the Court of Federal Claims’ decision that its compensation should be limited to a 1% royalty rate. Hughes argues that the court erred as a matter of law by treating the rates contained in the letters to Ford-Philco, TRW and MBB as a ceiling on the royalty rate. Also, Hughes asserts that the rates contained in the letters were artificially low due to widespread infringement of the Williams patent and due to the settlement context in which two of them were sent. Hughes further contends that reliance on the letters was improper because this conflicts with the policy behind Federal Rule of Evidence 408 which in certain circumstances requires the exclusion of evidence of offers made attempting to compromise a disputed claim. Finally, Hughes argues that the determination of the 1% royalty award was based upon three clearly erroneous factual findings. Specifically, Hughes takes issue with the findings that all of the 81 spacecraft determined to be compensable were “scientific or experimental” as that designation was used in the MBB letter, that the royalty base contemplated in the three letters was relatively smaller than the royalty base at issue here, and that during the term of the Williams patent non-infringing substitutes were available. Although it sought a 15% royalty rate before the Court of Federal Claims, Hughes now argues that it is entitled to at least a 3% royalty rate, which it derives from the proffered royalty rate for license of the Williams patent as set forth in two of the letters to the aerospace companies.
The government in its cross-appeal makes two arguments. First, it contends that the delay compensation rates were erroneous as a matter of law because they reflect a risk premium that Hughes did not bear. Moreover, the government says the court erred in failing to account for the annual taxes Hughes would have been required to pay had the royalties been paid currently. Second, the government asserts that Hughes is not entitled to compensation for spacecraft using the “store and execute” method for controlling the precession jet because, despite the contrary holding in Hughes VII, these spacecraft do not infringe the Williams patent. The government asks us to reject Hughes VII as law of the case in view of the subsequent holding in Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 4 USPQ2d 1737 (Fed.Cir.1987) (in banc), which it suggests is inconsistent with the doctrine of equivalents analysis applied in Hughes VII.
DISCUSSION
I.
A. The government’s unlicensed use of a patented invention is properly viewed as a taking of property under the Fifth Amendment through the government’s exercise of its power of eminent domain and the patent holder’s remedy for such use is prescribed by 28 U.S.C. § 1498(a). Pitcairn v. United States, 212 Ct.Cl. 168, 547 F.2d 1106, 1114, 192 USPQ 612, 616 (1976); see also Leesona Corp. v. United States, 220 Ct.Cl. 234, 599 F.2d 958, 966-67, 202 USPQ 424, 432-33 (1979) (discussing the various ways patent infringement by the government was characterized prior to the enactment of 28 U.S.C. § 1498); Decca Ltd. v. United States, 225 Ct.Cl. 326, 640 F.2d 1156, 1166, 209 USPQ 52, 59 (1980). Under section 1498(a), the patent owner is entitled to its “reasonable and entire compensation for such use and manufacture.” Because recovery is based on eminent domain, the proper measure is “what the owner has lost, not what *1572 the taker has gained.” Leesona, 599 F.2d at 969, 202 USPQ at 435. Generally, the preferred manner of reasonably and entirely compensating the patent owner is to require the government to pay a reasonable royalty for its license as well as damages for its delay in paying the royalty. See, e.g., Decca, 640 F.2d at 1167-68, 209 USPQ at 60 (discussing the various methods for valuing a patent license taken by the government); Leesona, 599 F.2d at 973, 202 USPQ at 438 (same). The parties do not dispute that this is the proper form of compensation; rather, they disagree as to the amount of compensation due and the manner in which it was determined.
Valuation determinations for purposes of eminent domain are reviewed for clear error as are determinations of what constitutes a reasonable royalty. Whitney Benefits, Inc. v. United States, 926 F.2d 1169, 1177-78 (Fed.Cir.1991); Branning v. United States, 784 F.2d 361, 364 (Fed.Cir. 1986); SmithKline Diagnostics, Inc. v. Helena Lab. Corp., 926 F.2d 1161, 1164, 17 USPQ2d 1922, 1925 (Fed.Cir.1991); Unisplay, S.A. v. American Elec. Sign Co., 69 F.3d 512, 517 n. 8, 36 USPQ2d 1540, 1544 n. 8 (Fed.Cir.1995). We will reverse a finding as clearly erroneous only if on the entire evidence we “are left with the definite and firm conviction that a mistake has been committed.” SmithKline, 926 F.2d at 1164, 17 USPQ2d at 1925 (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). In determining what constitutes a reasonable royalty, the court has discretion to make certain subsidiary decisions, such as what methodology to use to arrive at a reasonable royalty, and those decisions are reviewed for an abuse of discretion. SmithKline, 926 F.2d at 1164, 17 USPQ2d at 1925; Unisplay, 69 F.3d at 517 n. 8, 36 USPQ2d at 1544 n. 8.
B. Hughes asserts that the Court of Federal Claims held as a matter of law that the rates contained in the letters to FordPhilco, TRW and MBB established a ceiling to the royalty rate. It contends that this was a legal conclusion, not a factual finding, and that the court’s conclusion is erroneous. The court, however, did not hold as a matter of law that a reasonable royalty can never go above the amount specified in a license offer. Rather, the court analyzed the three letters at issue, as well as other factors, Hughes XII, 31 Fed. Cl. 481 at 488-90, 35 USPQ 2d at 1248-50, and found that in this case the rates quoted in the letters had the effect of placing a ceiling on the royalty rate. See Unisplay, 69 F.3d at 519, 36 USPQ2d at 1545-46 (holding that a reasonable royalty larger than that contained in license proposals and agreements was not supported by the evidence). Thus, while trying to cast its argument as one attacking a legal conclusion, Hughes is in essence challenging the court’s factual findings based on its weighing of the evidence. That, however, is the special province of the trial court and we review such factual findings for clear error. Inwood Lab., Inc. v. Ives Lab., Inc., 456 U.S. 844, 856, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982).
Both parties rely on the Court of Claims decision in Pitcairn to support their respective positions on whether offers to license a patented invention should or should not be viewed as a ceiling to the reasonable royalty. Pitcairn, however, provides no hard and fast rule. Pitcairn illustrates that the circumstances surrounding the industry as a whole as well as other relevant factors should be considered to determine what weight to afford an offer to license an invention. The facts of a particular case may call for a reasonable royalty that is more, less or the same as the offered royalty. See Pitcairn, 547 F.2d at 1118, 192 USPQ at 618-19 (finding it appropriate under the facts of that case to take into account offers to license a patent when determining a reasonable royalty).
The Court of Federal Claims, as is appropriate, looked at the relevant facts and circumstances at the time when infringement began. As set forth above, the court relied on numerous factors in addition to the Hughes license offers as supporting its finding that hypothetical negotiators would not have agreed to a license at a rate greater than 1.2%. Based on the evidence we are not convinced that the court clearly erred in determining that the ceiling royalty rate in a hypothetical negotiation would be 1.2%.
*1573 Hughes also contends that the court clearly erred by failing to take into account the consequence of widespread infringement of the Williams patent. We discern no such failing and are not convinced that any upward adjustment of the court’s royalty determination is required for this reason.
The eases cited by Hughes do not, as it argues, support the broad proposition that the court must reject or give very little weight to offers made when there is widespread infringement. Rather these cases stand for the proposition that the entirety of the circumstances should be considered and that the court can consider the effects of infringement. See, e.g., Sun Studs Inc. v. ATA Equip. Leasing, Inc., 872 F.2d 978, 994, 10 USPQ2d 1338, 1351 (Fed.Cir.), vacated in part, 872 F.2d 978, 11 USPQ2d 1479 (Fed. Cir.1989), overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 22 USPQ2d 1321 (Fed.Cir. 1992) (stating that a court can take into account the commercial consequences of infringement and need not act as if there had been no infringement); Deere & Co. v. International Harvester Co., 710 F.2d 1551, 1557, 218 USPQ 481, 486 (Fed.Cir.1983) (stating that the district court could discount the probative value of a license negotiated against a backdrop of continuing litigation); Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078-79, 219 USPQ 679, 682 (Fed. Cir.1983) (stating the trier of fact did not err in rejecting offers to license after infringement had begun as evidence of an established royalty); Nickson Indus. v. Rol Mfg. Co., 847 F.2d 795, 798, 6 USPQ2d 1878, 1880 (Fed.Cir.1988) (stating that a higher royalty “may be awarded when the evidence clearly shows that widespread infringement made the established royalty artificially low”).
While we agree that it is appropriate to look at what effect infringement has had on the value of a patent, the court need not consider that in a vacuum. It should take into account other evidence as was done in this case. The court expressly found that at the time of issuance of the Williams patent in 1973 “the space industry was a booming one with prospects for exponential growth” and that “[t]his was the context of Hughes’ con-tacts with three major aerospace firms over the period from 1974 to 1978 in an effort to license the Williams patent.” Hughes XII, 31 Fed. Cl. at 486, 35 USPQ2d at 1246. The court also considered the context in which the offers were made. It noted that one was made while litigation was pending but as a continuation of earlier licensing negotiations and not in settlement of that claim, that one was made in settlement of claims but contained an indication of “normal” royalty rates and that the other was made while no litigation was pending. In addition, apart from its eonclusory statements that infringement must have lowered the rates offered, Hughes has pointed to no evidence showing that the offers in the letters were actually reduced because of widespread infringement. While Hughes points to certain instances of infringement, it does not show that the license offers were affected by these infringements. In contrast, the court found that one of the letters expressly stated that the proffered royalty rate was Hughes’ “normal” rate, not a low rate it was willing to accept because of infringement, thus belying on its face Hughes’ contention that the royalty rate was depressed by infringement.
Because the Court of Federal Claims considered the infringement context in which the licensing offers were made as well as other pertinent facts, we are not convinced that the court clearly erred in failing to find that widespread infringement had depressed the indicated royalty rate.
Hughes’ claim that the litigation context surrounding the Ford-Philco and MBB letters artificially lowered the rates contained in those letters is intertwined with the foregoing contention. Hughes also argues that those letters were statements made in compromise negotiations and that the court’s consideration of them violates the policy behind Federal Rule of Evidence 408. Before the Court of Federal Claims, however, Hughes had no objection to the introduction of these letters and stated that because this case was tried to the court it was sure the letters would “be given the weight they deserve.” Unable now to challenge their admissibility, Hughes attacks the weight given these letters by the Court of Federal Claims. *1574 We have previously related the court’s discussion of the litigation context of these offers, as well as other factors the court considered. Suffice it to say that we discern no clear error in the court’s consideration of the Ford-Philco and MBB offers or in its failure to agree with Hughes’ contention that the litigation artificially lowered the royalty rates proposed in these license offers.
Hughes also argues that the court’s finding that the government’s spacecraft were “scientific or experimental” as opposed to “commercial” as those terms were used in the MBB letter is clearly erroneous. After consideration of all the evidence, the court determined that the spacecraft were more akin to scientific and experimental vehicles than commercial vehicles. This finding is supported by the testimony of both parties’ experts who each stated that the satellites were experimental and that the government was not in the business of operating satellites for profit. Moreover, Hughes has failed to point to any evidence showing that the spacecraft were being used for commercial purposes, that commercial profit was made, or that any other such indicia of eommerciality existed. We therefore cannot say the court clearly erred in finding that the spacecraft should be considered experimental.
Finally, the court did not clearly err in supporting its determination of the royalty rate with the finding that the potential royalty base of the competitors receiving the royalty offers was smaller than the royalty base in this case, which included all spacecraft costs and payload costs, and with the finding that there were acceptable non-infringing alternatives. Hughes’ evidence and arguments are insufficient to overturn these findings. Furthermore, these findings were just two out of many that the court used to support its royally rate determination and Hughes has failed to show that any error associated with these findings would be anything but harmless.
Because the Court of Federal Claims did not clearly err or abuse its discretion in its determination of a reasonable royalty rate, we affirm the 1% royalty rate.
II.
A. The government argues that the interest rates arrived at by the Court of Federal Claims to calculate delay damages overcompensate Hughes for the delay in payment. The government characterizes the royalties owed Hughes as similar to a loan to the government which carries no risk. Under this view, the government argues that the delay damages should be calculated based on the rates paid on Treasury bills. The government criticizes the rates used by the court as improperly including a premium for risk that Hughes did not bear.
A court has discretion in determining the delay compensation rate. See Pitcairn, 547 F.2d at 1122, 192 USPQ at 622 (“The determination of a proper amount of delay compensation is a judicial function. The discharge of that function requires the exercise of judgment.”). In Pitcairn, the Court of Claims approved the use of long-term corporate bond yields as a measure of delay damages because they indicate broad trends and relative levels of investment yields and reflect the amount that the patentee has lost. 547 F.2d at 1122, 1124, 192 USPQ at 622, 624. It then held in Tektronix that the 7.5% rate it found applicable for 1975 in Pitcairn “should be applied (from now on) to just compensation cases, without need of proof in the individual instance, unless and until it is affirmatively demonstrated that under the theory of the Pitcairn opinion the rate for years after 1975 should differ from [that rate].” 552 F.2d at 352, 193 USPQ at 394. The Pitcairn analysis was applied in Miller to determine that a rate of 8.5% would be appropriate in a land takings case for the years 1976 to 1979, 620 F.2d at 840, and in Bendix, to determine that the tax overpayment rates were appropriate for the period from January 1, 1980 to the date of judgment in that case, 676 F.2d at 615-16. The Court of Federal Claims did not abuse its discretion in adopting these rates for the applicable periods.
The government also argues that the methodology used by the court for calculating delay damages overcompensates Hughes by failing take into account the taxes Hughes would have paid in the years that royalty *1575 compensation was due. Expressing concerns about double taxation, the Supreme Court in Hanover Shoe v. United Shoe Mach. Corp., 392 U.S. 481, 503, 88 S.Ct. 2224, 2237, 20 L.Ed.2d 1231 (1968), held that courts do not have to reduce a damage award by the amount of taxes that would have to be paid. This court has applied that rationale in other cases, see Kalman v. Berlyn Corp., 914 F.2d 1473, 1482-83, 16 USPQ2d 1093, 1100 (Fed. Cir.1990), and it is equally applicable to delay damages.
In this case the Court of Federal Claims rejected the government’s argument that damages should be reduced by prior years’ taxes. It determined that such a reduction (1) had been rejected by the ease law; (2) would be speculative due to Hughes’ particular tax situation, including what actions Hughes might have taken to reduce such taxes in prior years; and (3) was not provided for by Congress in the tax overpayment provisions. The court did not abuse its discretion in reaching this conclusion.
Finally, the government challenges the court’s award of compound rather than simple interest. It is well settled that the determination whether to award simple or compound interest is a matter largely within the discretion of the trial court. Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1555, 35 USPQ2d 1065, 1077 (Fed.Cir.1995) (in banc); accord City of Milwaukee v. Cement Div. Nat’l Gypsum Co., — U.S. —, —, 115 S.Ct. 2091, 2096, 132 L.Ed.2d 148 (1995) (stating that the allowance of prejudgment interest “rests very much in the discretion of the tribunal which has to pass upon the subject, whether it be a court or a jury” (quoting The Scotland, 118 U.S. 507, 518-19, 6 S.Ct. 1174, 1175-76, 30 L.Ed. 153 (1886))); Dynamics Corp. v. United States, 766 F.2d 518, 520, 226 USPQ 622, 623 (Fed.Cir.1985) (holding that prejudgment interest may include compound interest). The government has failed to establish that the court abused its discretion in fixing the delay damages.
B. The government argues that Hughes VII should not be the law of the case after this court’s in banc decision in Pennwalt. Thus, it asserts that “store and execute” (S/E) spacecraft do not infringe the Williams patent and should not be included in the compensation base.
In Hughes VII, this court noted two differences between the S/E spacecraft and the claimed invention of the Williams patent that precluded a finding of literal infringement: (1) certain of the S/E spacecraft do not contain the means for providing an indication of instantaneous spin angle (ISA) to ground control required by paragraph (e) of claim 1; and (2) none of the S/E spacecraft contain the means for receiving control signals for immediate execution required by paragraphs (f) and (g) of Claim l.[3] 717 F.2d at 1361, 219 USPQ at 480. This court held, however, that the S/E spacecraft infringed the Williams claims under the doctrine of equivalents. The Hughes VII opinion noted that the trial court’s doctrine of equivalents analysis failed to apply the doctrine properly to the claimed invention and erred in requiring “obvious and exact equivalents” for claim limitations. Id. at 1364, 219 USPQ at 482. Based on the specification and engineering evidence, the court concluded that “retention of the ISA position in an on-board computer, while transmitting sufficient information to enable the ground crew to use that computer-retained information to control the satellite, is the modern-day equivalent of providing an indication of ISA to ground” as required by paragraph (e) of claim 1. Id. at 1365, 219 USPQ at 483. It also determined that the external synchronization of the command signal with the ISA position as specified in *1576 paragraphs (f) and (g) is equivalent to the internal synchronization accomplished on-board the S/E spacecraft by using modern memory circuits. Id., at 1366, 219 USPQ at 484. The court said that use of ISA information onboard as a reference point for firing the jet, instead of using the ISA information on the ground as a reference point, was merely a relocation in the function and did not change the function performed, the manner of operation, or the result obtained. Id. at 1366, 219 USPQ at 484.
Four years after Hughes VII, this court sitting in banc stated in Pennwalt that it was well settled under the doctrine of equivalents “that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent.” 833 F.2d at 935, 4 USPQ2d at 1739-40 (quoting Perkin-Elmer Corp. v. Westinghouse Elec. Corp., 822 F.2d 1528, 1523-33, 3 USPQ2d 1321, 1324-25 (Fed.Cir. 1987)). The dissenting opinion in Pennwalt asserted that the majority was requiring the “obvious and exact equivalents” requirement that was rejected in Hughes VII. Id. at 941-42, 4 USPQ2d at 1744-45 (Bennett, S.J., dissenting).
The government now argues that Hughes VII is inconsistent with Pennwalt primarily on the basis of the views expressed in the dissenting opinion. We, of course, have the power to revisit the decision of the Hughes VII court. The Supreme Court has instructed, however, that this power of courts to revisit their own prior decisions should be sparingly exercised by stating that “as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was ‘clearly erroneous and would work a manifest injustice.’” Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811, 7 USPQ2d 1109, 1117 (1988) (quoting Arizona v. California, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 1391 n.8, 75 L.Ed.2d 318 (1983)). The government has failed to show that any such circumstances exist.
In Hughes VII the court was faced with applying the doctrine of equivalents to a claim written in means plus function language, and thus had to apply the doctrine of equivalents to a claim which under 35 U.S.C. § 112, H 6, included the structure of the specification and equivalents. The court concluded in this instance that the trial court had required “obvious and exact equivalents” which made the doctrine of equivalents analysis the same as for literal infringement, and that the court had, therefore, erred as a matter of law in applying that doctrine. 717 F.2d at 1364,219 USPQ at 482.
In Hughes VII, as discussed above, the court noted the similarities and the differences between the claimed invention and the S/E spacecraft and the fact that the teachings of Williams were used to develop the S/E spacecraft. Id. at 1365-66, 219 USPQ at 482-83. It then considered each claim limitation not literally found in the S/E spacecraft and looked at whether the elements of the S/E spacecraft performed the same function in substantially the same way to obtain the same result. Id. at 1365-66, 219 USPQ at 483-84. Because there was an equivalent for each claim limitation not literally met, Id. at 1365-66, 219 USPQ at 483-84, the court concluded that the differences between the claimed invention and the S/E spacecraft were too insubstantial to avoid liability under the doctrine of equivalents. See id. at 1365, 219 USPQ at 483 (“Advanced computers and digital communications techniques developed since Williams permit doing on-board a part of what Williams taught as done on the ground____ [A]n embellishment made possible by post-Williams technology, does not allow the accused spacecraft to escape the “web of infringement.’ ” (quoting Bendix Corp. v. United States, 220 Ct.Cl. 507, 600 F.2d 1364, 1382, 204 USPQ 617, 631 (1979))).
This analysis in the court’s prior decision is therefore entirely consistent with Pennwalt, as well as this court’s more recent in banc decision in Hilton Davis v. Wamer-Jenkinson Co., 62 F.3d 1512, 35 USPQ2d 1641 (Fed.Cir.1995), cert. granted, — U.S. —, 116 S.Ct. 1014, 134 L.Ed.2d 95 (1996). There is no indication in the majority opinion in Pennwalt that Hughes VII was being overruled or that it was inconsistent with Pennwalt. Moreover, one member of the majority expressly countered the assertion of inconsis *1577 tency put forth by the dissent by stating that Hughes VII merely distinguished equivalency in a doctrine of equivalents analysis from equivalency of structure of disclosed means in a § 112, 116 analysis. Id. at 949, 953, 4 USPQ2d at 1751, 1755 (Nies, J., additional views).
In Hilton Davis, we stated that the “application of the doctrine of equivalents rests on the substantiality of the differences between the claimed and accused products or processes, assessed according to an objective standard.” 62 F.3d at 1518, 35 USPQ2d at 1645. We noted that the funetion/way/result test is properly used in many cases to measure the substantiality of the differences. Id. at 1518, 1522, 35 USPQ2d at 1645, 1648. Moreover, we stated that “the trial judge does not have discretion to choose whether to apply the doctrine of equivalents when the record shows no literal infringement” and may consider such evidence as copying. Id. at 1519, 35 USPQ2d at 1646. As described above, the Hughes VII court applied these very principles.
The dissent apparently would decide Hughes VII differently if the case were before this panel, arguing that the approach taken by the Hughes VII dissent is the approach required under current law. This is not, however, a sufficient justification to refuse to follow law of the case. There is little doubt that this was a close case and reasonable minds could differ on the proper outcome of Hughes VII. Indeed, one member of the Hughes VII court dissented. That this was a close case, however, counsels in favor of abiding by the law of the ease. Christianson, 486 U.S. at 819, 108 S.Ct. at 2179, 100 L.Ed.2d 811, 7 USPQ2d at 1117 (“ ‘The doctrine of law of the case is ... a heavy deterrent to vacillation on arguable issues.’ ” (quoting IB James W. Moore, et al., Moore’s Federal Practice 110.404[1] (1984))). Simply because a different panel might reach a different conclusion, does not mean that the earlier decision is “clearly erroneous.” See id.
The dissent makes the further point that we should not consider the length of time this litigation has been pending and urges the court to stay the issuance of this decision until the Supreme Court decides Hilton Davis. Because no showing was made to justify staying the decision in this case, we should not ignore the fact that it has been ongoing for over twenty-three years. The “promptness of decision ... in all judicial actions is one of the elements of justice.” Forsyth v. City of Hammond, 166 U.S. 506, 513, 17 S.Ct. 665, 668, 41 L.Ed. 1095 (1897). The litigants in this action deserve finality. Over such a long period of time, the composition of the panels of this court and the judge assigned to the case at the trial level has necessarily changed. As a matter of course, different judges looking at the same case may not view it in the same way. But under the law of the case, we must give respect and force to legal decisions rendered by earlier panels, absent a clear showing of error or injustice. Any other result would unduly prolong this already drawn-out litigation.
CONCLUSION
The judgment of the Court of Federal Claims is affirmed for the reasons above set forth.

AFFIRMED.

. During this litigation twelve prior opinions have issued. The first eight reported decisions are listed in Hughes Aircraft Co. v. United States, 15 Cl.Ct. 550, 551 n. 2, 8 USPQ2d 1989, 1990 n. 2 (1988) (Hughes IX), and the tenth through twelfth are referenced in Hughes XII, 31 Fed. Cl. at 483 n. 2, 35 USPQ2d at 1244 n. 2. This ordering is used herein to number the Hughes opinions cited repeatedly. Two other decisions involving the Williams patent are listed in Hughes IX, 15 Cl.Ct. at 551 n. 2, 8 USPQ2d at 1990 n. 2.

. The McLean patent (United States Patent No. 3,216,674) was the first to disclose the basic concept of pulsing a jet to correct the spin axis of a satellite, and the government had a non-exclusive license to use it.

. These paragraphs of claim 1 read as follows:
e. means disposed on said body for providing an indication to a location external to said body of the instantaneous spin angle position of said body about said axis and the orientation of said axis with reference to a fixed external coordinate system;
f. and means disposed on said body for receiving from said location control signals synchronized with said indication;
g. said valve being coupled to said last-named means and responsive to said control signals for applying fluid to said fluid expulsion means in synchronism therewith for processing said body to orient said axis in a predetermined desired relationship with said fixed external coordinate system.
See Hughes VII, 717 F.2d at 1355, 219 USPQ at 475-76, for the entire claim 1.