HUGHES AIRCRAFT COMPANY,
Plaintiff–Appellant,

v.

The UNITED STATES, Defendant/Cross–
Appellant.

Nos. 94–5149, 95–5001.

United States Court of Appeals,
Federal Circuit.

April 7, 1998.

Kenneth W. Starr, Kirkland & Ellis, Washington, DC, argued for plaintiff-appellant. With him on brief were Jay I. Alexander, and Christopher Landau, Washington, DC; and Philip C. Swain, Los Angeles, CA. Also on the brief were Victor G. Savikis, Jones, Day, Reavis & Pogue, Los Angeles, CA; and John J. Higgins and Wanda K. Denson–Low, Hughes Aircraft Company, Los Angeles, CA.

Thomas J. Byrnes, Asst. Director, Commercial Litigation Branch, Civil Division, Dept. of Justice, Washington, DC, for defendant–cross appellant. With him on brief were Frank W. Hunger, Asst. Atty. Gen.,

and Vito J. DiPietro, Director. Of counsel on the brief were B. Frederick Buchanan, Jr. and William C. Bergmann, Attys., Dept. of Justice, Washington, DC.

Before RADER, Circuit Judge, ARCHER, Senior Circuit Judge,* and BRYSON, Circuit Judge.

ARCHER, Senior Circuit Judge.

This case returns to this court after the Supreme Court's vacatur and remand of *Hughes Aircraft Co. v. United States,* 86 F.3d 1566, 39 USPQ2d 1065 (Fed.Cir.1996) (*Hughes XIII*), in light of the Court's decision in *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). *See United States v. Hughes Aircraft Co.,* —— U.S. ——, 117 S.Ct. 1466, 137 L.Ed.2d 680 (1997) (*Hughes XIV*). Because *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 219 USPQ 473 (Fed.Cir.1983) (*Hughes VII*) satisfies the legal requirements announced in *Warner–Jenkinson,* we affirm.

## BACKGROUND

Hughes Aircraft Company (Hughes) commenced this suit in 1973 under 28 U.S.C. § 1498, asserting that the United States infringed Hughes' United States Patent No. 3,758,051 issued to Williams (the Williams patent). The Williams patent relates to an apparatus for control over the orientation, or attitude, of a spacecraft using commands from a ground control station. The relevant limitations of claim 1 of the Williams patent read:

(e) means disposed on said body for providing an *indication to a location external to said body of the instantaneous spin angle position* of said body about said axis and the orientation of said axis with reference to a fixed external coordinate system;

(f) and means disposed on said body for receiving *from said location control signals synchronized* with said indication;

(g) said valve being coupled to said last-named means and responsive to said control signals for applying fluid to said fluid expulsion means *in synchronism therewith* for precessing said body to orient said axis into a predetermined desired relationship with said fixed external coordinate system.

(Emphasis added). In order to correct the attitude of the spacecraft, the ground crew must be able to calculate the instantaneous spin angle (ISA) position. The ISA position is the angle between two specific planes. The first plane, the rotating plane, is defined by the location of the precessing jet and the satellite's axis of rotation. The second plane, the reference plane, is defined by a fixed reference point in an external coordinate system (such as the sun or another star) and the spin axis. The angle between these planes at a given moment in time is the ISA position with reference to a fixed external coordinate system. Thus, the ISA position generally measures the location of the precessing jet in its rotational cycle relative to the reference plane.

Two pieces of information are needed to calculate the ISA position: the spin rate of the satellite and the instant in time at which the rotating plane passes by the fixed point in the fixed external coordinate system and at which the jet is closest to the fixed reference point. The invention uses onboard sensors to collect this data and then transmits this information to earth to allow the ground crew to determine the satellite's existing and desired orientations. After making the necessary calculations, the ground crew pulses the attitude jet by radio signal commands to precess, or tip, the spin axis of the satellite to the desired position.

In the accused "store and execute" (S/E) craft, the satellite retrieves the same raw data but calculates the ISA position onboard. The spin rate and information to determine the orientation of the satellite is transmitted to the ground. In most of the S/E craft, the

---

* Senior Circuit Judge Glenn L. Archer, Jr. vacated the position of Chief Judge on December 24, 1997.

satellite does not provide information sufficient to calculate the ISA position.[1] After receiving the spin rate, the ground crew performs the necessary calculations to adjust the attitude of the craft. This information is then sent to and stored in the satellite. The precession does not occur, however, until the ground crew sends an execute command to the satellite.

In 1982, the then-Court of Claims originally determined, *inter alia*, that the accused S/E devices did not infringe the patent literally or under the doctrine of equivalents. *See Hughes Aircraft Co. v. United States*, 215 USPQ 787, 812 (Ct.Cl. Trial Div.1982) (*Hughes VI* ). On appeal, this court reversed the noninfringement judgment, holding that the S/E devices infringe under the doctrine of equivalents, and remanded for a determination of just compensation. *See Hughes VII*, 717 F.2d at 1366, 219 USPQ at 484. After the decision by the Court of Federal Claims on remand, Hughes appealed, challenging the assessment of damages, and the government cross-appealed, again challenging the liability determination of *Hughes VII* in light of this court's in banc decision in *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 4 USPQ2d 1737 (Fed.Cir.1987) (in banc). *See Hughes XIII*, 86 F.3d at 1566, 39 USPQ2d at 1066 (Fed.Cir.1996). This court affirmed the damages determination and refused, under the doctrine of law of the case, to reconsider the *Hughes VII* decision. *See id.* at 1576, 39 USPQ2d at 1072. The Supreme Court, however, granted certiorari, vacated the judgment, and remanded the case (GVR order) to this court for reconsideration in light of its decision in *Warner–Jenkinson*. *See Hughes XIV*, —— U.S. at ——, 117 S.Ct. at 1466.

## DISCUSSION

### I.

■ As a threshold matter, we must address the scope of the Supreme Court's GVR order. Generally, the Supreme Court will issue a GVR order:

> [w]here intervening developments, or recent developments that we have reason to believe the court below did not fully consider, reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ultimate outcome of the litigation. . . .

*Lawrence v. Chater*, 516 U.S. 163, 167, 116 S.Ct. 604, 607, 133 L.Ed.2d 545 (1996) (per curiam); *see also Lords Landing Village Condominium Council of Unit Owners v. Continental Ins. Co.*, —— U.S. ——, ——, 117 S.Ct. 1731, 1732, 138 L.Ed.2d 91 (1997) (per curiam). The use of a GVR order "assists the court below by flagging a particular issue that it does not appear to have fully considered." *Lawrence*, 516 U.S. at 167, 116 S.Ct. at 606. Vacatur and remand by the Supreme Court, however, does not create an implication that the lower court should change its prior determination. *See United States v. M.C.C. of Florida, Inc.*, 967 F.2d 1559, 1562 (11th Cir.1992) ("The Supreme Court did not take a position on whether *Tull* [*v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987)] actually affected the outcome of *M.C.C. I*, but was instructing this court to make that determination."); *United States v. National Soc'y of Prof'l Eng'rs*, 555 F.2d 978, 982 (D.C.Cir.1977), *aff'd*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

■ The government argues that the Supreme Court effectively vacated both *Hughes VII* and *Hughes XIII*; thus, this court is to review anew the trial court's judgment in *Hughes VI*. Hughes responds that only *Hughes XIII* was vacated and that the only issue before this court is whether *Warner–Jenkinson* provides a compelling reason to depart from the law of the case established by *Hughes VII*.

---

1. Even for the craft that do supply sufficient data, however, the ground crew does not rely on the information to precess the satellite because the information is retained on board the satellite. Instead, this information appears to be transmitted for research purposes.

We conclude that the scope of our review on remand is limited to determining whether *Hughes VII* satisfies the legal analysis required by *Warner–Jenkinson*.[2] A GVR order "merely requires further consideration in light of a new Supreme Court decision" and does not "nullify all prior proceedings." *M.C.C.*, 967 F.2d at 1561. Nothing in the petition for a writ of certiorari suggests the sweeping effect posited by the government. Indeed, in its petition, the government argued that "[a]n intervening decision of [the Supreme Court], rather than the court of appeals, obviously would provide a more compelling basis for that court's departure from the law of the case on remand." Petition for Writ of Certiorari at 11 n. 5, *Hughes XIV* (No. 96–1297). Thus, the government itself recognized that its petition was not a request for a vacatur of both *Hughes VII* and *Hughes XIII* but rather was limited to a vacatur of the latter. Had the Supreme Court intended to reinstate the trial court's judgment, it could have explicitly done so. *See Union Pacific R.R. Co. v. Johnson*, 249 F.2d 674, 676 (9th Cir.1957).

## II.

Turning to the merits, we first address the effect of the "all-elements" rule (sometimes referred to as the "all-limitations" rule) enunciated in *Warner–Jenkinson* on the *Hughes VII* decision. The Supreme Court clarified the doctrine of equivalents by noting that:

> [e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.

520 U.S. at ——, 117 S.Ct. at 1049. Thus, the test for equivalence is to be applied to the individual claim limitations:

An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element.

*Id.* at ——, 117 S.Ct. at 1054; *see Pennwalt*, 833 F.2d at 935, 4 USPQ2d at 1740 (" '[T]he plaintiff must show the presence of every element or its substantial equivalent in the accused device.' To be a 'substantial equivalent,' the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed." (citations omitted) (quoting *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532–33, 3 USPQ2d 1321, 1324–25 (Fed.Cir. 1987))).

The government argues that the all-elements rule demands that we depart from the reasoning in *Hughes VII*, in which the court stated that the trial court erred in not "apply[ing] the doctrine of equivalents to the claimed invention as a whole." *Hughes VII*, 717 F.2d at 1364, 219 USPQ at 482. According to the government, to conclude that the claim limitations in paragraphs (e), (f), and (g) are met equivalently by elements in the accused devices would vitiate those claim limitations. The government additionally urges that the arguably corresponding elements of the S/E system differ substantially from the claim limitations by storing the ISA position value onboard in lieu of transmitting an indication of the ISA position to the ground, by not acting in synchronism with the control signals, and by not firing the precession jet within a fixed period of time after receiving the command signal.

Hughes responds that there is no reason to depart from the conclusion reached in *Hughes VII* because *Warner–Jenkinson* did not significantly alter the all-elements rule as

---

2. Because the scope of this remand is limited as such, we decline the government's invitation to revisit the issue of whether the panel in *Hughes VII* engaged in improper appellate fact-finding.

stated in *Pennwalt.* Moreover, the *Hughes VII* court, in Hughes' opinion, did perform the required element-by-element analysis mandated by *Warner–Jenkinson.*

We conclude that the analysis performed in *Hughes VII* satisfies the all-elements rule as stated in *Warner–Jenkinson.* Regarding claim paragraph (e), the court in *Hughes VII* concluded that the transmission to the ground crew of the spin rate and information sufficient to calculate the sun angle in the S/E vehicles "is the modern day equivalent to providing an indication of the ISA to the ground...." 717 F.2d at 1365, 219 USPQ at 483. This information, while insufficient to calculate the ISA position, was sufficient to enable the ground crew to control the satellite, which is substantially the same function performed and the identical result achieved by transmitting the indication of the ISA position to the ground. *See id.*

Furthermore, although the information sent is insufficient to calculate the ISA position, this does not demonstrate a substantial difference in the way the element functions. This is a case in which a "subsequent change in the state of the art, such as later-developed technology, obfuscated the significance of [the] limitation at the time of its incorporation into the claim." *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1425, 44 USPQ2d 1103, 1107 (Fed.Cir.1997); *cf. Warner–Jenkinson,* 520 U.S. at ——, 117 S.Ct. at 1053 ("Insofar as the question under the doctrine of equivalents is whether an accused element is equivalent to a claimed element, the proper time for evaluating equivalency ... is at the time of infringement, not at the time the patent was issued."); *Pennwalt,* 833 F.2d at 938, 4 USPQ2d at 1742 ("[T]he facts here do not involve later developed computer technology which should be deemed within the scope of the claims to avoid the pirating of an invention."). The court in *Hughes VII* determined that the change in the S/E devices was the result of a technological advance not available until after the patent issued. *See Hughes VII,* 717 F.2d at 1365, 219 USPQ at 483. Relying on testimony of one of skill in the art at the time of infringement, the court in *Hughes VII* concluded that this advance resulted in an insubstantial change in the way the element performed its function. *See id.* (citing testimony that an engineer would realize that transmission of the ISA position was no longer necessary as a result of the change in technology).

The court in *Hughes VII* also concluded that the "synchronism" limitations in paragraphs (f) and (g) were also equivalently met by the accused devices. Again, as a result of an advance in technology, the satellite system was able at the time of infringement to store the precession information and to wait to precess the satellite until receipt of the execute command. Thus, the synchronism in the accused device is coordinated by the computer instead of by real-time execution of the command from the ground. As recognized in *Hughes VII,* "[t]he difference between operation by retention and operation by sending is achieved by relocating the function, *making no change in the function performed, or in the basic manner of operation, or in the result obtained.*" *Id.* at 1366, 219 USPQ at 484. The court in *Hughes VII* correctly performed an analysis of the function, way, and result of the individual elements in the accused devices and concluded that these elements equivalently met the claim limitations at issue.

Accordingly, we conclude that *Warner–Jenkinson* provides no basis to alter the decision in *Hughes VII* because the court properly applied the all-elements rule.

### III.

We now turn to the issue of *Warner–Jenkinson*'s impact on the doctrine of prosecution history estoppel. The Supreme Court concluded in *Warner–Jenkinson* that

[p]rosecution history estoppel continues to be available as a defense to infringement, but if the patent-holder demonstrates that an amendment required during prosecution had a purpose unrelated to patentability, a court must consider that purpose in

order to decide whether an estoppel is precluded.

520 U.S. at ——, 117 S.Ct. at 1054. The Court articulated a rebuttable presumption of prosecution history estoppel that arises whenever an amendment to a claim is made but the reason for that amendment is not known from the intrinsic evidence.

■ The government argues, however, that *Warner–Jenkinson* further requires prosecution history estoppel to act as an absolute bar, and thus to preclude *any* equivalents to a claim limitation that was added to overcome a patentability rejection, regardless of what subject matter was surrendered. The patentee thus would be limited to the literal scope of the particular claim limitation. For support, the government relies on the following statement in *Warner–Jenkinson* in which the Supreme Court addressed the newly articulated rebuttable presumption:

> Mindful that claims do indeed serve both a definitional and a notice function, we think the better rule is to place the burden on the patent-holder to establish the reason for an amendment required during patent prosecution. The court then would decide whether that reason is sufficient to overcome prosecution history estoppel as a *bar to application of the doctrine of equivalents* to the element added by that amendment. Where no explanation is established, however, the court should presume that the PTO had a substantial reason related to patentability for including the limiting element added by amendment. In those circumstances, prosecution history estoppel would *bar the application of the doctrine [sic, of] equivalents* as to that element.

*Id.* at ——, 117 S.Ct. at 1051 (emphasis added). Thus, the government urges that Hughes should be precluded from asserting any equivalents to paragraphs (e), (f), and (g) because these limitations were added to overcome prior art.

Hughes responds that, aside from the rebuttable presumption, the Supreme Court did not alter this court's prosecution history estoppel analysis, which previously rejected the bright-line rule posited by the government. According to Hughes, such an approach is inconsistent with the requirement that the reasons for an amendment are to be considered.

We reject the government's contention that *Warner–Jenkinson* requires such a wooden approach to prosecution history estoppel. The Supreme Court has long recognized that the key to prosecution history estoppel is the surrender or disclaimer of subject matter by the patentee, which the patentee is then unable to reclaim through the doctrine of equivalents. *See Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126, 136, 62 S.Ct. 513, 518–19, 86 L.Ed. 736 (1942) ("By the amendment he recognized and emphasized the difference between the two phrases and proclaimed his abandonment of all that is embraced in that difference. The difference which he thus disclaimed must be regarded as material, and since the amendment operates as a disclaimer of that difference, it must be strictly construed against him." (citations omitted)); *see also Sutter v. Robinson*, 119 U.S. 530, 541, 7 S.Ct. 376, 381–82, 30 L.Ed. 492 (1886) ("He is not at liberty now to insist upon a construction of his patent which will include what he was expressly required to abandon and disavow as a condition of the grant.").

■ In evaluating the reason behind an amendment, a court must determine what subject matter the patentee actually surrendered. *See Warner–Jenkinson*, 520 U.S. at —— n. 7, 117 S.Ct. at 1051 n. 7 ("What *is* permissible for a court to explore is the reason (right or wrong) for the objection *and the manner in which the amendment addressed and avoided the objection*." (latter emphasis added)); *see, e.g., Roemer v. Peddie*, 132 U.S. 313, 317, 10 S.Ct. 98, 99, 33 L.Ed. 382 (1889) (finding no infringement because the patentee had confined his claim to "an arrangement not found in the defendants' structure" to obtain its allowance); *Shepard v. Carrigan*, 116 U.S. 593, 597, 6 S.Ct. 493, 494–95, 29 L.Ed. 723 (1886) (find-

ing no infringement because the accused skirt protector lacked plaited or fluted bands to which the patentee had limited her claim to distinguish the prior art); *see also La-Bounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 867 F.2d 1572, 1576, 9 USPQ2d 1995, 1999 (Fed.Cir.1989); *Bayer Aktiengesellschaft v. Duphar Int'l Research B.V.*, 738 F.2d 1237, 1243, 222 USPQ 649, 653 (Fed.Cir.1984). If the accused device wholly fails to meet a limitation to which the patentee has expressly limited the claims, a finding of equivalence is precluded under prosecution history estoppel.

■ We conclude, however, that no such estoppel arises here. The PTO originally rejected Hughes' claim for obviousness in light of U.S. Patent No, 3,216,674, issued on November 9, 1965 to McLean (the McLean Patent). In response to this rejection, Williams canceled his original claims and inserted, *inter alia*, the claim that issued as claim 1 and contained the limitations in paragraphs (e), (f), and (g).[3] The McLean patent relates to a space vehicle with a self-contained navigation system that maintains a collision course with a target body. As the target body changes its position, the McLean vehicle automatically alters its course relative only to the target. Although the vehicle disclosed in the McLean patent precesses in the same fashion as the Williams invention, it differs from the Williams vehicle by performing precession without two-way communication with an external location and without reference to a fixed, external coordinate system. Williams' amendments thus did not surrender subject matter covering a device, such as the accused device, which provides two-way communication with an external location (although some calculations are made onboard instead of at the external location) and which uses an external coordinate system.

Because these amendments to the claim language were made to overcome a prior art rejection, they do serve to narrow the range of equivalents; however, they do not preclude all equivalents available to Hughes. *See Hughes VII*, 717 F.2d at 1363, 219 USPQ at 482. Because the accused device does not fall within the range of subject matter surrendered, prosecution history estoppel does not preclude infringement under the doctrine of equivalents. *See id.* at 1362, 717 F.2d 1351, 219 USPQ at 481.

## IV.

■ We note that the Supreme Court vacated *Hughes XIII* in its entirety, including our determinations regarding damages. A lower court, however, is "free to adopt any or all of [the prior decision] that, upon reconsideration, it determine[s] to be unaffected by [the relevant Supreme Court case]." *M.C.C.*, 967 F.2d at 1561. Because *Warner–Jenkinson* did not affect our decision regarding damages, we reinstate those portions of *Hughes XIII*. *See M.C.C.*, 967 F.2d at 1562.

## CONCLUSION

Because the decision in *Hughes VII* satisfies the requirements of *Warner–Jenkinson*, we affirm the judgment of the Court of Federal Claims. We reinstate the determinations of *Hughes XIII* as they relate to damages.

*AFFIRMED.*

---

**3.** Because the reason for the amendment, to overcome the PTO's obviousness rejection in light of the McLean patent, is clear from the prosecution history the rebuttable presumption of prosecution history estoppel does not arise in this case. *See Warner–Jenkinson*, 520 U.S. at

——, 117 S.Ct. at 1051; *see also Hilton Davis Chem. Co. v. Warner–Jenkinson Co.*, 114 F.3d 1161, 1163, 43 USPQ2d 1152, 1153 (Fed.Cir. 1997) (in banc) (noting that the presumption arises when "the prosecution history does not reveal the reason for the change").